## ACKERMAN et al. v. REPUBLIC AVIATION CORPORATION.

### Civ. No. 7244.

United States District Court
E. D. New York.

Feb. 10, 1949.

George Morton Levy, of Mineola, N. Y. (McCarthy & McGrath and Herman J. McCarthy, all of New York City, of counsel), for plaintiffs.

John J. Ryan, of New York City (Bleakley, Platt, Gilchrist & Walker, Frank A. Fritz and Anthony T. Antinozzi, all of New York City, of counsel), for defendant.

ABRUZZO, District Judge.

This action is brought by 26 plaintiffs under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216, subdivision (b). This Act provides that the employer shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages. The defendant is a corporation organized and existing under the laws of the State of Deleware. The plaintiffs were employed at the Farmingdale, Long Island, plant of the defendant. The action was originally commenced in the Supreme Court, Nassau County, but upon application of the defendant it was transferred to this Court upon the ground of diversity of citizenship. The 26 plaintiffs worked under various titles, under diverse classifications, and the gravamen of the complaint seeks to recover unpaid overtime compensation and

liquidated damages such as penalties and attorneys' fees.

Throughout the period which is the subject of this litigation, this aviation corporation was engaged solely in the manufacture, production and assembling of the P-47 (Thunderbolt) airplane under Contract No. W535 ac-29279 (8356) with the United States Army Air Forces. These planes were used strictly as fighter aircraft. Before this contract was entered into with the United State Army Air Forces, the defendant manufactured what was known as the Republic "Seabee," a commercial type of plane. Throughout the period of employment of these plaintiffs, however, the proof indicates that none of these "Seabee" type of plane was manufactured, and the work which the plaintiffs performed for which they now seek damages was solely under the contract just alluded to for P-47 (Thunderbolts).

The sum which these plaintiffs seek to recover is approximately $236,000, and the period involved is approximately from February, 1942, to V-J Day in August, 1945.

Some of these plaintiffs were employed as expeditors or buyers, and for some period of time they acted in both capacities. Some were group leaders, and it is claimed that some were acting in the capacity of settlement administrators and tool analysts.

In order to support the plaintiffs' claim of damages, it is necessary, first, for this Court to determine whether the defendant was engaged in the production of goods for interstate commerce, pursuant to the claim made in the complaint, paragraphs Third to Fifth, inclusive. The defendant sets up in its answer, paragraphs 1 to 3, inclusive, a denial of this contention. If the plaintiffs were not engaged, as claimed, in interstate commerce, or if they were not engaged in the production of goods for interstate commerce, the plaintiffs' claim of necessity must fall.

The defendant sets up other defenses such as (1) that each of the plaintiffs was compensated on a salary basis of not less than $200 per month, and that the plaintiffs for the period of their employment were employed in a bona fide executive or administrative capacity within the meaning of Section 13 of the Fair Labor Standards Act, 29 U.S.C.A. § 213, and that each of them, therefore, is exempt from the benefits of the Act; (2) that the defendant's classification of each of the plaintiffs was made in good faith and in conformity with and in reliance upon administrative regulations, rules, orders, interpretations, and practice of the Wages and Hours Division of the United States Department of Labor, and that the defendant, therefore, would not be subjected to any liability or punishment for failure to pay overtime compensation to the plaintiffs; and (3) that, if it be found that the plaintiffs are entitled to overtime, no liquidated damages should be allowed by reason of the good faith on the part of the defendant in its classification of the plaintiffs. Portal-to-Portal Act, Sec. 11, 29 U.S.C.A. 260.

It is, therefore, essential that I first review whether the plaintiffs were engaged in interstate commerce, or were engaged in the production of goods for commerce. The facts with relation to this particular issue seem not to be in dispute and may be briefly summarized as follows: From 1941 to 1945, the defendant was engaged exclusively and solely in making fighter aircraft for the United States Government and, as I said, they were known as P-47 (Thunderbolts) and were used in the various theatres of war. The defendant had no private business during this period. From early 1942 to the end of the war, these planes were produced under a cost-plus-a-fixed-fee contract with the United States Government (Exhibit 1). Under this contract, the fee of the defendant was fixed, but the cost of producing the airplanes was estimated. As a general rule, these airplanes were delivered to the Government at defendant's flying field at Farmingdale, Long Island, to which place the Government sent its own pilots to take delivery and fly them away to the various bases. There were times when the Government requested shipments by rail and when this request was made they were shipped f. o. b. Farmingdale under a government bill of lading. The defendant produced some 15,000 of these Thunderbolts and spare parts equivalent to 2,400 additional planes.

The plaintiffs in performing their duty helped to expedite or bought the raw materials and parts used in the building of these Thunderbolts, and all of this work was done exclusively in connection with the production of these aircraft. The defendant at its peak employed some 16,500 at its Farmingdale plant. A major portion of the plant and facilities used by the defendant, to be exact about 98%, was owned by the United States Government. The buildings were occupied by defendant under a lease with the Defense Plant Corporation for a rental of $1.00 per year and the payment of taxes. These taxes were later reimbursed by the Government. The title to all material, parts, tools, machinery, equipment and supplies purchased pursuant to the cost-plus contract wherever located was in the Government. Some of the equipment furnished, to be installed in the airplanes, was sent to the plant by the Government. Representatives of the United States Army Air Forces were stationed at the defendant's plant and they consisted of a contracting officer, inspectors, accountants, auditors, and many others. The contract had a provision that all of the material and workmanship was subject to the inspection and tests by representatives of the Government, and the contracting officer had power to make changes in or additions to the specifications, could issue additional instructions, require additional work, or direct the omission of work covered by the contract. The Army representatives had power to review the purchase orders and approve the payrolls of the company and, particularly, the pay of the plaintiffs involved in this litigation. The defendant did not abandon what is known as the profit system for it did make some profit from these contracts, and some of the defendant's private buildings were used in the work necessary to be done in the assembling and making ready for delivery of these Thunderbolts.

The plaintiffs claim that during all the time which is the subject of this cause of action the defendant was engaged in interstate commerce and cite various cases in support of their contention.

The defendant claims that the production of fighter aircraft for the United States Government for war purposes was not interstate commerce within the meaning of Section 3, subdivision (i), of the Act, 29 U.S.C.A. § 203(i), citing other cases.

If the cases uphold the defendant's contention as raised in this action, the plaintiffs' cause of action must fall. Whether defendant's defense is to be upheld depends upon the interpretation of the cases decided by the Circuit Courts of Appeal and the United States Supreme Court with respect thereto.

Kennedy v. Silas Mason Co., 5 Cir., 164 F.2d 1016, was an action for overtime compensation under the Fair Labor Standards Act of 1938, and the theory of the action and the facts are comparable to the case at bar. The defendant constructed and operated an ordnance plant in Louisiana under the terms of a cost-plus-a-fixed-fee contract with the United States Government. The plaintiff and others similarly situated sued for overtime, penalties, and attorney's fees claimed to be due under the Fair Labor Standards Act of June 25, 1938, alleging that they had been employed in interstate commerce and in the production of goods for commerce, within the meaning of Title 29 U.S.C.A. Sec. 203. The defendant manufactured munitions of war for the Government. These munitions did not at any time go into or become a part of commerce as defined by the Fair Labor Standards Act. They were not manufactured for sale, nor were they ever intended for commercial purposes. It sold nothing in interstate commerce, it delivered nothing in interstate commerce, and shipped nothing except as an agent or instrumentality for the loading of munitions.

When viewed in the light of the powers reserved to the Government under this cost-plus-a-fixed-fee contract, the decision of the Circuit Court held that the defendant was not an independent contractor. Transportation by the Government of munitions owned by the Government during war for use by its armed forces was not commerce within the meaning of the Fair Labor Standards Act.

The Kennedy case distinguished Bell v. Porter, 7 Cir., 159 F.2d 117, certiorari denied, 330 U.S. 817, 67 S.Ct. 1092, 91 L.Ed.

1267. In the Porter case, the defendant was engaged in the manufacture of shells, explosives, and munitions for the armed forces, under a cost-plus-fixed-fee contract with the United States Government. The Government owned the buildings, but these buildings were maintained and operated by appellants as independent contractors. The Porter opinion concluded that the defendant-appellants had complete supervision of all employees, including the hiring and discharging of all employees, and maintained their own fire department in which appellees were employed as fire fighters. It will thus be seen that the Porter case is somewhat different than the Kennedy case.

The Circuit Court of Appeals for the Fifth Circuit in the Kennedy case held that the plaintiffs were working directly under the supervision of the United States Government, that munitions were not a part of commerce within, the meaning of the Act, and that in any event munitions were not "goods" within the meaning of the Act. The Kennedy case, 334 U.S. 249, 68 S.Ct. 1031, was reviewed by the United States Supreme Court which vacated the judgment of the Circuit Court and remanded the case to the District Court for reconsideration and amplification of the record. The United States Supreme Court was reluctant to make a decision based upon the summary judgment, stating as follows upon that point, 334 U.S. at pages 256, 257, 68 S.Ct. at page 1034:

"But summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice.

"We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts. While we might· be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide. * * *"

Some of the language used in the Supreme Court case is rather enlightening. It stated that the defendant was, in a sense, no more than a nominal defendant, for it was entitled to reimbursement from the Government. It drew attention to the fact that the Army was concerned with the great cost to which the Government would be subjected if numerous suits akin to this were lost. The Army believed that the classes of employees involved in these cases were well paid; they accepted their compensation without complaint or expectation of receiving more until the litigation was commenced sometime after the termination of their employment, and accordingly there was little equity in the employees' position. This same reasoning can be applied to the case at bar.

On the question of who was the employer, there seemed to be a dispute in the Kennedy case. Controversy arose over the way in which the two parties, the Government and the defendant, in actual practice construed their contracts. The plaintiffs sought to draw a contrary version of inferences to be drawn from the dealings between the employees and the defendant. The Supreme Court thought that the record should be made more complete upon this subject. It did not appear clearly whether the defendant or the Government was the actual employer, or whether the war-time legislation intended to set up a wholly new system of war production, which was neither private enterprise nor government operation, but an amalgamation of the two, and which prescribed a complete system of labor relation by statute which superceded and precluded operation of the Fair Labor Standards Act. That broad contention was not submitted to the District Court, and the United States Supreme Court was reluctant to reach a conclusion which should rest on an indefinite factual foundation. The hearing of contentions as to disputed facts, the sorting of documents to select relevant provisions, ascertain their ultimate form and meaning, the practical construction put on them by the parties, and re-

duction of the mass of conflicting contentions as to fact and inference from facts, is a task primarily for one judge, not for a court of nine. Thus, the case was sent back for a full hearing and trial before the District Court.

In the instant case, Army Air Force representatives were stationed at the defendant's plant. They consisted of contracting officer, inspectors, accountants, auditors, and others. The witness, Thomas David, testified as follows (S.M. 1986-87):

"Q. Mr. Davis, all during the war were there representatives of the Army air force stationed at the Republic plant at Farmingdale? A. Yes.

"Q. What were the general branches of operations with which the Army air force representatives were concerned? A. Well, they first had an air force resident representative. They had a contracting officer; they had their inspectors, and their own accounting and auditing staffs.

"Q. In the matter of the payrolls involved, both the payroll for overtime employees, non-overtime employees and those on this so-called confidential payroll, were those payrolls and the amounts paid submitted to and approved by the Army Air Force representative? A. Yes, they had a great deal to do with the amounts paid out.

"Q. Were they approved? A. They were approved I believe with the exception of the administrative payroll, that they would only approve amounts paid out on that payroll up to a certain figure.

"Q. But in any event the Army Air Force representative exercised scrutiny and watchfulness over all those three payrolls, is that correct? A. Yes."

In addition to this testimony, the contract provided that all material and workmanship was subject to inspection and tests by representatives of the Government, and that the contracting officer could make changes or additions to the specifications, could issue additional instruction, require additional work, or omit some of the work. The purchase orders which these plaintiffs were directly concerned in were reviewed by Army representatives and the payrolls were approved by the representatives of the Army.

The witness, Lawrence J. Cunningham, testified to the following (S.M. 2354):

"A. We had a number of Army personnel that worked directly for the Army. We had a contract officer who had a group, I would say, of probably eight or ten people, which also reviewed purchase orders in accordance with the cost plus contracts, and we also had an Army auditing section, and we had the general accounting, which, of course, is maintained by the Army but that is another Government agency.

"Q. Army inspector? A. We had a full force of Army inspectors. * * *"

Exhibit 1 and this testimony indicate clearly that the Government supervised both the work done by these employees and the pay each was to receive. During the course of the employment of the plaintiffs, their hours of work were changed from time to time and the pay was increased or decreased, pursuant to the number of hours they worked each week. The amount of pay which each plaintiff received from time to time had to have the approval of the Army personnel.

It seems clear to me that the plaintiffs were actually in the employment of the Government, and that the defendant was not in fact an independent contractor, but an agent for the Government. Increases in salary for some of the plaintiffs involved in this action pursuant to a wage plan adopted were required to be submitted to the Salary Stabilization Unit and were in fact approved by the Treasury Department. Before approval it was necessary to determine whether or not any employees for whom increases were sought were employed in an administrative capacity under the definition of the word "administrator" under the Fair Labor Standards Act. This would corroborate to a great extent that the defendant was in fact while doing this work an agent of the Government. It is important to note in making this determination that the defendant did no private work of any kind during the period we are concerned with, nor was it required to pay any rental for the buildings used by it and owned by the Government, except the

nominal amount of $1.00 per year. It is, hence, inconceivable to characterize the defendant as an independent contractor.

Divins v. Hazeltine Electronics Corp., 2 Cir., 163 F.2d 100, was an action brought for overtime compensation and liquidated damages under the Fair Labor Standards Act of 1938 for services performed between January 1, 1942, and December 31, 1945. Summary judgment was granted in favor of the defendant and the question presented on appeal was whether the plaintiffs, in performing the work for which they claimed overtime compensation, were "engaged in commerce or in the production of goods for commerce," within the meaning of Section 7 of the Act, 29 U.S.C.A. § 207. The district judge held that they were not within either category.

The defendants made a contract with the United States Navy Department to recruit and train field engineers and to supply specified "man months" of technical professional services of such engineers who were to be subject to the direction of the Department. In the performance of this work, the plaintiffs worked at naval bases and private shipyards in several states under the direction of naval officers, and part of the work consisted of installing, servicing, and maintaining radar and radio equipment on various types of ships. Some of the equipment used had been manufactured by the defendant; most of it was the product of other manufacturers. The type of ships worked on were auxiliary mine sweepers, armed cargo transports, armed water distillery ships, and other Navy craft. The Circuit Court agreed with the conclusion that any work of repairing equipment of vessels of war did not constitute services rendered in interstate commerce or the production of goods for commerce. Employees repairing equipment on instrumentalities of commerce such as "armed cargo transports" and "armed transports" may be regarded as engaged in commerce, even though the goods or persons they transport would be devoted to war effort after arrival at destination. In that opinion, the Circuit Court stated as follows, 163 F.2d at page 102:

"To hold that workmen who repair aircraft carriers, battleships, submarines or other types of vessels used as weapons of war are 'engaged in commerce,' stretches the quoted words, elastic though they be, beyond all reasonable limits. The test, as stated in McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538, 'is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it. * * * '"

The summary judgment was set aside by the Circuit Court and the case remanded. With respect to what is meant by the phrase "engaged in the production of goods for commerce," the Circuit Court further said, 163 F.2d at page 103:

"With respect to installation on ships which can properly be regarded as instrumentalities of commerce, we believe the argument sound, but we think it fallacious with respect to installations on vessels which are solely instruments of war. * * * We therefore agree with the district judge that the appellants were not within the coverage of the Act when installing equipment on war vessels. * * * "

The case heard before me, unlike the Kennedy case, is based upon the facts as testified to by witnesses in a long voluminous record and the exhibits. It seems clear upon this record that the Government was in fact the actual employer.

I do not think the system of labor relation between the defendant and these plaintiffs intended to preclude the operation of the Fair Labor Standards Act. The facts and the exhibits in the instant case lead to the conclusion that the defendant was not engaged in interstate commerce, nor was it producing goods for interstate commerce. My interpretation of the opinion in the Kennedy case indicates that this finding is correct. The language in the Divins case lays down the rule that to hold workmen who repair aircraft carriers, battleships, submarines, or other types of vessels used as weapons of war stretches the words "engaged in commerce." I can see no distinction between fighter sea craft and fighter aircraft.

584

I must, therefore, hold that, in my opinion (1) the defendant was not an independent contractor; (2) P-47 (Thunderbolts), the aircraft used for war purposes only does not come within the phrase "production of goods for commerce"; and (3) the defendant was not engaged in interstate commerce within the meaning of the phrase as defined in the Fair Labor Standards Act.

I have not reviewed nor passed upon the other defenses set up by the defendant in view of the fact that I have upheld the contentions raised by the defendant as outlined in this opinion.

I, therefore, direct judgment on the merits in accordance with this opinion in favor of the defendant. Findings of fact and conclusions of law may be submitted on notice.